# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE NETHERLANDS INSURANCE** | ) | |
| **COMPANY** *as subrogee of JEANNETTE* | ) | |
| *SPECIALTY GLASS***,** | ) | |
| | ) | **2:11-cv-00338** |
| **Plaintiff,** | ) | **(Consolidated-Lead Action)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WEST PENN POWER COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Presently pending before the Court is the MOTION FOR SUMMARY JUDGMENT (Doc. No. 31) filed by Defendant, West Penn Power Company ("West Penn" or "Defendant"), on its counterclaim (Doc. No. 9) filed against Plaintiff, The Netherlands Insurance Company ("Netherlands" or "Plaintiff"), as subrogee of Jeanette Specialty Glass ("JSG). The issues have been fully briefed (Doc. Nos. 32, 35, 41, 42), and the factual record has been thoroughly developed through the submission of Defendant's CONCISE STATEMENT OF MATERIAL FACT (Doc. No. 33) and Plaintiff's responses and opposition thereto (Doc. No. 34). Accordingly, the motion is ripe for disposition.

## Background

This litigation concerns a now-consolidated subrogation action in which Plaintiff seeks to recover monies paid to its insured, Jeanette Specialty Glass, for property damage to a glass furnace allegedly caused by West Penn and/or Palco Sales Corporation ("Palco"). The following background information is taken from the evidentiary record and is not in dispute for the purpose

of this Memorandum Opinion unless otherwise noted.[1]

At all relevant times, JSG operated a glass manufacturing facility in Jeannette, Pennsylvania that produced light fixtures, tiles, sinks, and dinnerware. The manufacturing process employed at JSG included the use of a glass furnace, which was constructed of refractory brick and operated at approximately 2,900 degrees Fahrenheit, a temperature controlled with electric blower motors. The proper operation of the glass furnace and its cooling fans was seemingly critical to the company's industrial production.

Pursuant to a contract executed on July 25, 2006, West Penn sold and supplied single phase and three phase electricity to JSG throughout the relevant time period. The record indicates that three phase electricity typically powers industrial equipment (*i.e.*, the electric blower motors that controlled the temperature of the glass furnace) and that West Penn provided that power to the JSG facility via a utility pole and three transformers that it owned, operated and maintained within the vicinity.

Much like West Penn, it appears that Palco also entered into a contract with JSG whereby it sold, supplied and installed a back-up generator with a transfer switch for use at the facility. According to Plaintiff, the transfer switch did not have loss of phase detection and/or loss of phase protection to safeguard JSG against property damage and other losses associated with power failures, voltage fluctuations, and loss of phase.

On February 9, 2010, JSG experienced voltage fluctuations and unbalanced phase with

---

1. The Court notes that in the Netherland's Response (Doc. No. 34) to the Concise Statement of Material Fact filed by West Penn (Doc. No. 33), Plaintiff makes admissions on behalf of Palco. *See, e.g.*, Doc. No. 34 at ¶ 27 ("It is admitted that the transfer switch that Palco sold JSG was not suitable for use in a three phase power distribution system because the transfer switch lacked the ability to detect and protect unbalanced phase."). The Court does not accept these admissions. Although Palco is a party in this now-consolidated subrogation action, it is not presently before the Court on the instant motion with the opportunity to admit or deny allegations. Indeed, Palco has denied similar factual averments in its Answer to Plaintiff's Complaint at Civil Action 2:12-00157. Thus, the Court notes these allegations, along with Plaintiff's other seemingly uncontroverted admissions, only for informational purposes to provide some background with regard to the purported power failure and ultimate collapse of the glass furnace.

regard to the three phase supply that West Penn provided.  The loss of phase led JSG to shut down the glass furnace and cooling fans for approximately two hours.  Although JSG had an emergency generator, that equipment failed to automatically engage and required manual start-up.  West Penn personnel later restored power and all of the equipment at JSG returned to normal operations the next day.

Following that incident, a glass engineer at JSG inspected the furnace and determined that its crown remained intact.  Inspections continued every day thereafter.  The glass engineer and his staff were also provided information on the temperature and condition of the furnace on a daily basis.

Approximately one month after the incident, on March 23, 2010, maintenance workers at JSG discovered a hole in the crown of the glass furnace after they noticed a bright light emanating from the equipment.  Maintenance workers at JSG then began the necessary process to shut down the glass furnace based on their finding, and the crown collapsed during the procedure.  Personnel at JSG would dismantled the glass furnace.

At the time of the incident, Plaintiff was an insurance carrier for JSG and allegedly paid, in whole or in part, $1,079,577.00 for the damages caused by the furnace collapse.  Since that time, Plaintiff, as subrogee of JSG, has filed two lawsuits to recover an unidentified portion of that sum.

First, Plaintiff commenced this action against West Penn on March 15, 2011 by the filing of a three-count Complaint at Civil Action 2:11-cv-00338, alleging claims of negligence, breach of warranty, and strict products liability.  The gravamen of the Complaint is that a West Penn transformer failed and caused the voltage fluctuations that entered the electrical distribution system and burned out the blower motors of the glass furnace.  To the Plaintiff, the inactivity of

the cooling fans led to the equipment overheating, compromised the structural integrity of the glass furnace, and caused the ultimate collapse on March 23, 2010.

Second, on February 9, 2012, Plaintiff initiated a nearly identical action against Palco at Civil Action 2:12-00157, proceeding under the same three theories of liability.  According to the Complaint, Palco sold, supplied, and installed the back-up generator and transfer switch "without phase detection and/or phase protection despite [its] knowledge that loss of phase detection and/or loss of phase protection was required for the safe operation of the motors and equipment used by Jeannette Specialty Glass at its facility."  (Doc. No. 1 at 2).  Plaintiff likewise concludes that if the transfer switch had loss of phase detection and/or loss of phase protection, "the February 9, 2009 damage to the blower motors would not have occurred, the furnace would not have overheated and the March 23, 2010 collapse would not have occurred."  (Doc. No. 1 at 3). By Order of Court dated July 18, 2012, the Court granted the motion to consolidate the two cases for the purposes of discovery and trial.

In addition to the two actions commenced by Plaintiff, other parties in this case have also brought companion actions against fellow litigants.  More specifically, Palco filed a third-party complaint against West Penn, and West Penn filed a counterclaim against Netherlands along with its Answer to the March 15, 2011 Complaint in which it seeks declaratory relief, alleging that certain contractual clauses in agreements between itself and JSG bar Plaintiff, as subrogee, from pursuing this action.

West Penn now moves for summary judgment on that counterclaim.  For the reasons discussed below, the Court finds that summary judgment is not appropriate at this time and therefore, the motion will be denied.

**Standard of Review**

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To withstand summary judgment, the non-movant must show a genuine dispute of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  A dispute is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

**Discussion**

According to West Penn, three documents control and provide sufficient grounds for this Court to grant summary judgment on its request for declaratory judgment.  Those agreements include (1) the Retail Tariff: Rates and Schedules and Rules and Regulations accepted by the Pennsylvania Public Utility Commission ("Tariff"); (2) an Electric Service Agreement ("ESA") dated July 25, 2006; and (3) West Penn Power's Customer Requirements for Electric Service ("CRES").  The Tariff outlines certain Rules and Regulations, which include the following two paragraphs:

3. Safety

It is necessary for the protection of the Customers that all wiring and equipment be installed and maintained by a capable electrician in a safe manner.

Compliance with the requirements of the National Electric Code shall be considered sufficient evidence of safe electrical installation. All wiring and equipment shall be inspected and approved by a duly qualified inspector before service is supplied.

4. Liability

The Customer, by accepting service from the Company, assumes full responsibility for the safety and adequacy of the wiring and equipment installed by the Customer. The Customer agrees to indemnify and save the Company harmless from any liability which may arise as the result of the use of service supplied to the Customer by the Company if such liability is caused, in whole or in part, by negligence of the Customer and not by the negligence of the company.

The Company does not guarantee but will endeavor to furnish a continuous supply of electric energy and to maintain voltage and frequency within reasonable limits. The Company shall not be liable for damages or losses which the Customer may sustain caused by or resulting from interruptions in service, variations in service characteristics (including but not limited to high or low voltage, operation of protection or control devices, the single phasing of three-phase service, and phase reversals) or neutral to ground voltage, except such damages and losses which are solely caused by or due to the negligence or willful and wanton misconduct of the Company. Any of the aforementioned conditions occurring as a result of electric system design common to the electric utility industry shall be conclusively deemed not to result from the negligence or willful and wanton misconduct of the Company.

(Doc. No. 9-2 at 2-3, ¶¶ 3-4). Similarly, paragraph 5 of the ESA, which incorporates the Tariff by reference, states that West Penn "will make a reasonable effort to supply Electric Service as required by this Agreement, but shall not be liable for any loss, damage expense, injury or death, or any claim thereof, resulting from a delay or failure to furnish said Electric Service unless caused by the sole negligence of the Company" and entirely disclaims consequential damages. (Doc. No. 9-1 at 1, ¶ 5). The CRES, although not legally binding, is generally consistent with the above-referenced clauses. *See, e.g.*, Doc. 9-3 at 3, § 7.03 ("The Company will not be responsible in any way for damage to the Customer's equipment that is due to failure of the Customer to provide adequate protection.").

Based on the clauses cited in those three documents, West Penn seeks to have this Court

declare that it is not liable for any damages, including consequential damages, arising from the alleged voltage fluctuations that occurred on February 9, 2010, and therefore, bar Netherlands from asserting its claim as subrogee of JSP.  West Penn first submits that the ESA and the Tariff contain permissible, binding, and dispositive provisions that limit its liability for damage caused by electrical interruptions and voltage variations—occurrences that arguably form the basis for Plaintiff's Complaint.  West Penn next argues that the inclusion of language exempting West Penn from all liability unless the damages and losses are caused by its "sole negligence or willful and wanton misconduct" illustrates that that the Court should apply the contractual maxim *expressio unius es exclusio alterius* to recognize that the parties agreed to exclude all other theories of liability, including breach of warranty and strict products liability.  According to West Penn, those provisions not only limit its liability, but also exempt the Company completely.

Distilled to its essence, West Penn presents the position that Plaintiff cannot recover absent record evidence showing that JSG was free of contributory negligence and that no other person or entity was negligent.  West Penn supports this assertion with language from the Tariff and ESA that requires the occurrence of a necessary precondition: a finding that any damages and losses resulted from its "sole negligence."  To demonstrate that liability does not rest solely, if at all, on the Company, West Penn (1) attempts to reason that despite the fact that JSG's operation depended on the glass furnace, nothing in the record indicates that Plaintiff provided adequate protection for its equipment and safeguard against damage caused by voltage fluctuations or the single phasing of three-phase service, and therefore, the absence of any

evidence to the contrary indicates that it cannot be solely negligent as a matter of law;[2] and (2) highlights the companion case, Civil Action 12-00157, in its effort to support the conclusion that the "unequivocal averments in the Palco complaint confirm that the damage to the glass furnace was not caused by [the] sole negligence of West Penn." (Doc. No. 32 at 17). West Penn further attempts to underpin this line of reasoning with its position that the Complaint and record are devoid of any allegations that establish it knew of, should have known of, was warned about, or could have discovered and corrected any patent and/or latent defect in the glass furnace cooling system or the transformer. Therefore, as the Company concludes, the damage to the glass furnace and cooling motors cannot be the result of its sole negligence.

In response, Plaintiff first attempts to characterize the contractual provisions on which West Penn heavily relies as exculpatory clauses void against public policy under Pennsylvania law that prohibits public utilities from insulating themselves from liability, as opposed to only permissibly limiting their liability. Plaintiff also argues that even assuming arguendo that West Penn's clauses are valid, the Court should still deny the motion for summary judgment, on among other grounds, the existence of genuine issues of fact "as to whether West Penn's negligence was the sole proximate cause of the unbalanced voltage fluctuations and resulting damages." (Doc. No. 35 at 2).

As an initial matter, the Court notes that it need not determine at this stage whether the various clauses of the Tariff and/or the ESA are limitations of liability provisions or exculpatory clauses void as against public policy, as the resolution of this issue is not necessarily dispositive of the present motion. *See generally State Farm Fire & Cas. Co. v. PECO*, -- A.3d -, 2012 PA

---

2. Contrary to West Penn's assertion that "nothing in the record indicates that JSG had installed any device to protect the glass furnace cooling motors form electrical interruptions or abnormal current," two sentences later West Penn notes "[t]he only protective device referenced in the record is an emergency generator." (Doc. No. 32 at 17). West Penn also offers its observation that "[e]ven assuming that JSG had installed protective devices on its cooling motors, those devices and motors were not dependable or sufficient to protect JSG's glass furnace to harm." *Id.*

Super 212 (Pa. Super. Ct. Oct. 3, 2012) (discussing the "legal framework within which to assess the validity of clauses purporting to limit a utility company's liability").  To be sure, while either interpretation inevitably precludes summary judgment on West Penn's request for declaratory relief, the principal basis for the denial rests on the movant having not shown that there are no genuine issues of material fact as Rule 56 requires.  Indeed, the theory offered by West Penn is replete with genuine disputes with regard to the facts that implicate the parties' potential liability, if any, and certainly requires the Court to prematurely resolve those issues, effectively usurping the role of the finder of fact.

West Penn offers the position, as previously noted, that the subrogee cannot recover unless JSG was free of contributory negligence and that no other person or entity was negligent based on the "sole negligence" language of the agreements.  To the extent that the Court interprets the Tariff and ESA as permissible limitations of liability and accepts West Penn's concept that a contractual maxim bars all liability but for damages caused by its "sole negligence," its motion for summary judgment cannot be granted.[3]  The natural application of the agreements first requires the Court, months before the close of discovery,[4] to somehow discern that JSG and/or Palco contributed to damaging the glass furnace and/or that West Penn was not the sole cause of its ultimate collapse.  West Penn asks this Court to make these factual findings based on an incomplete record and otherwise uncontroverted averments.  The use of the agreements at this stage then necessitates that the Court allocate the percentage of liability among the parties, apportioning at least one percent (1%) of liability to any party in addition to any amount assigned to West Penn in order to exonerate the Company completely and excuse it

---

3.  While the Court assumes the validity of the Tariff and ESA and construes its provisions as limitations of liability *infra*, nothing in this Memorandum Opinion should be construed as a determination on the merits of whether the agreements contain exculpatory clauses that are void against public policy.

4.  The parties submitted a Joint Motion for Enlargement of Discovery (Doc. No. 43) on November 1, 2012, and the Court granted that request and extended the deadline for fact discovery to February 10, 2013.  (Doc. No. 44 at 1).

from repaying the subrogee in whole or in part.

The responsibility to assign liability is generally reserved for the finder of fact and the Court will not commandeer that role. *See, e.g.*, *Tortu v. A-1 Quality Limousine Serv.*, CIV.06-3952(RBK), 2008 WL 3887612, at *3 (D. N.J. Aug. 18, 2008) ("Where, as here, issues of material fact prevent the Court from determining liability as a matter of law, this allocation of percentages of responsibility is an issue reserved for the finder of fact."). This determination is not to say that the Court will never entertain or decide issues with regard to liability at this stage. *See, e.g.*, *Perasso v. Caesars Cove Haven, Inc.*, 3:10-CV-1476, 2012 WL 2121244, at *5 (M.D. Pa. June 12, 2012) ("[The] apportionment of fault is generally within the jury's province, and should not be analyzed by the court except in certain circumstances where 'the facts so clearly reveal the plaintiff's negligence that reasonable minds could not disagree as to its existence.'") (citations omitted). However, when an undeveloped record presents substantial issues of material fact, the ultimate determination of which would impact liability, summary judgment is not appropriate. *C.f. Perasso*, 2012 WL 2121244, at *5 (citing *Peair v. Home Ass'n of Enola Legion No. 751*, 430 A.2d 665, 669 (Pa. Super. Ct.1981) (citation omitted) ("[S]ummary judgment is a poor device for deciding questions of comparative negligence.")).

Here, there is no record evidence or undisputed facts to allow the Court to make the finding that either West Penn was without any negligence whatsoever or that another party was also negligent, thereby releasing West Penn from all liability because any damage(s) and loss(es) did not result from its "sole negligence." From the perspective of the Court, the disputes in this consolidated action include, among others, the origination and effect of the voltage fluctuations and loss of phase, the suitability (or lack thereof) of the Palco transfer switch, and the precise cause(s) that led to the burnout of the blower motors, the failure of the emergency generator(s) to

automatically engage, and the ultimate collapse of the furnace.  Thus, summary judgment based on West Penn's theory is premature at this time and therefore, will be denied.

To the extent that the Court interprets the agreements as containing exculpatory clauses that are void against public policy, the outcome does not change.  However, as noted above, the Court declines to address the merits of the position offered by Plaintiff in its brief in opposition regarding the validity of the Tariff and ESA, which it submits primarily as a defense to defeat summary judgment.  The application of those agreements not only presents factual issues when addressed from the perspective of West Penn, but also leads to a premature examination of the potential applicability of the clauses when observed from the viewpoint of Plaintiff.  With the benefit of further discovery and an ultimate determination by the finder of fact, the "sole negligence" provision may not even apply should a jury or this Court find that no liability rests with West Penn.  Thus, to invoke the invalidity of the "exculpatory clauses" as a defense only and at this early juncture does not require a decision on what is otherwise a contract interpretation issue when the movant cannot even meet the basic requirements of Rule 56 that are necessary in order to merit summary judgment.

## Conclusion

For the reasons hereinabove set forth, the MOTION FOR SUMMARY JUDGMENT (Doc. No. 31) filed by Defendant, West Penn Power Company on its counterclaim (Doc. No. 9) will be DENIED in its entirety.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE NETHERLANDS INSURANCE** | ) | |
| **COMPANY** *as subrogee of JEANNETTE* | ) | |
| *SPECIALTY GLASS*, | ) | |
| | ) | **2:11-cv-00338** |
| **Plaintiff,** | ) | **(Consolidated-Lead Action)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WEST PENN POWER COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER OF COURT

AND NOW, this 8th day of November, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the MOTION FOR SUMMARY JUDGMENT (Doc. No. 31) filed by Defendant, West Penn Power Company on its counterclaim (Doc. No. 9) is **DENIED** in its entirety. The parties are further instructed to docket all future filings at the Lead Action, 2:11-cv-00338.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc:     **John A. Robb , Jr., Esquire**
          Email: jrobb@rlmlawfirm.com
          **William N. Clark , Jr., Esquire**
          Email: wclark@cozen.com

          **Lee R. Demosky, Esquire**
          Email: ldemosky@mdbbe.com

          **Peter B. Skeel, Esquire**
          Email: pskeel@summersmcdonnell.com